[Civ. No. 2118. Fourth Appellate District.—January 26, 1938.]

R. A. STORRS et al., Appellants, v. BELMONT GOLD MINING & MILLING COMPANY (a Corporation) et al., Respondents.

H. C. Millsap for Appellants.

Halverson & Halverson for Respondents.

MARKS, J.—This is an appeal from a judgment in favor of Belmont Gold Mining and Milling Company (hereinafter

called the mining company), quieting title in and to eighteen lode mining claims, and one mill site claim, except against the mortgage interest of defendant Roger J. O'Reilley, and the paramount title of the United States.

Plaintiffs commenced this action to quiet title to the claims. The mining company denied plaintiffs' title, asserted title in itself, and filed a cross-complaint to quiet title against plaintiffs. O'Reilley denied plaintiffs' title and asserted the lien of his mortgage. The case was submitted on an agreed statement of facts supplemented by brief testimony of witnesses.

The mining company is a California corporation. About May 1, 1931, its corporate powers were suspended because of failure to pay its franchise tax. (Stats. 1929, p. 19.) It was reinstated on petition of L. V. Storrs, who paid the delinquent taxes. The certificate of revivor was dated September 29, 1933.

The stipulated facts pertinent to this appeal may be summarized as follows: That the mining company was legally entitled to possession of the property involved and was its owner, subject to the rights of the United States, "up to and including July 1, 1930"; that on July 15, 1930, the mining company made a contract with L. V. Storrs to do the assessment work on the property for the year ending July 1, 1931; that for this work Storrs was to receive 90,000 shares of the capital stock of the mining company; that proof of labor performed by Storrs was recorded by C. S. Price, a stockholder, on September 12, 1931; that on September 21, 1931, the commissioner of corporations issued a permit under which the mining company issued 90,000 shares of its capital stock to L. V. Storrs and his nominees; that the stock was issued to Storrs and his nominees and placed in escrow for them; that on April 16, 1932, after the stock had been issued and placed in escrow the commissioner of corporations suspended the permit because of the suspension of the mining company's right to do business; "that on August 17, 1931, the corporation and L. V. Storrs entered into a purported contract of lease under which the corporation was lessor and L. V. Storrs was lessee which purported contract is attached hereto marked exhibit IV and made a part hereof; that pursuant to the terms of said purported contract L. V. Storrs performed the assessment work required by law for the assessment year July 1, 1931, to July 1, 1932, upon all

of the mining claims in controversy herein''; that this lease gave Storrs the right of possession of the property and required him to mine ore therefrom; that on July 6, 1932, this lease was extended for one year from August 17, 1932, with one change in its terms not important here; that on June 21, 1933, it was again extended for six months from August 17, 1933, with provisions for a further extension; that on June 30, 1932, an act of Congress suspended for one year the necessity of doing assessment work on mining claims; that a second act of Congress suspended the necessity for assessment work under certain conditions between July 1, 1932, and July 1, 1933; that other acts of Congress were subsequently passed suspending the necessity for assessment work under certain conditions during all times material to this appeal; that various stockholders of the mining company recorded affidavits attempting to take advantage of these acts of Congress; that on March 14, 1932, at a purported stockholders' meeting four new directors, including L. V. Storrs, were elected to take the places of four directors who retired; that at a purported directors' meeting held on the same day L. V. Storrs was elected president of the mining company; that on October 3, 1933, after the revivor of the mining company a meeting of the new purported board of directors was called and held in which L. V. Storrs participated; that at this meeting a resolution was passed ratifying all acts, transactions and contracts of the mining company during its period of suspension and particularly the contracts with Storrs; that on January 23, 1934, a stockholders' meeting was held at which L. V. Storrs and others were elected directors and thereafter on the same day a directors' meeting was held in which L. V. Storrs participated; that on January 31, 1934, L. V. Storrs posted notices of location on the mining claims and claimed the property as his; that on May 14, 1934, L. V. Storrs deeded one-third of his interest in the mining property to plaintiff H. H. King and two-thirds to plaintiff R. A. Storrs; that plaintiffs took with notice of the claims of the mining company to the property; that on May 14, 1934, plaintiffs took possession of the mining property and thereafter excluded the mining company therefrom; that on September 30, 1934, ''plaintiffs voluntarily relinquished possession of seven of said mining claims hereinafter more particularly described, and on the same day notices

in the name of Marie Bronson, a citizen of the United States, were posted on each of said seven claims and on October 6, 1934, were filed in the office of the county recorder of San Bernardino County, and on November 22, 1934, the said Marie Bronson executed and delivered to the plaintiffs the deed attached hereto marked exhibit XX and made a part hereof, and on November 22, 1934, the said plaintiffs went back into possession of said seven claims"; that Marie Bronson had notice of the claims of the mining company to the property; that the mining company demanded possession of and attempted to enter upon the claims but was excluded by plaintiffs.

The stipulation contains two other provisions which require quotation. They are as follows:

"That all the facts herein stipulated to as happening subsequent to the filing of the complaint herein shall be deemed to have been alleged as herein set forth in said complaint. . . .

"The validity of all the acts of the corporation, its directors or officers or anyone acting in its behalf as hereinbefore set forth is admitted except in so far as those acts may be affected by the suspension of the corporation rights, powers, and privileges as mentioned in Paragraph I hereof."

It is clear that plaintiffs' sole ground for a reversal of the judgment is under the provisions of section 32 of the Bank and Corporation Franchise Tax Act (Stats. 1929, p. 19; Stats. 1931, p. 2228), which, with exceptions not applicable here, suspended the right of a domestic corporation to do business if it failed to pay its corporation franchise tax. They maintain that all the acts of the mining company and everything done in its behalf during the period of suspension were void. They further maintain that all acts of its board of directors after its revivor were void because four of the seven directors who participated in those meetings were elected during the suspension period and were, therefore, neither qualified nor elected; that the three remaining qualified directors could not hold a lawful directors' meeting as they did not constitute a quorum.

For the purposes of this opinion we may concede that the four directors elected during the suspension period were not the *de jure* directors of the corporation. They were, however, its *de facto* directors and with the three *de jure* directors constituted a *de facto* board that could act for the

corporation after the revivor.  (*Jones* v. *Peck*, 63 Cal. App. 397 [218 Pac. 1030].)

Plaintiffs contend that as the lease and extensions were executed during the period of suspension they were void.  They thus attempt to escape the results of a firmly established rule that a tenant cannot contest the title of his landlord.  This contention has been decided adversely to plaintiffs in the case of *Depner* v. *Joseph Zukin Blouses*, 13 Cal. App. (2d) 124 [56 Pac. (2d) 574], where it is said:

"Appellants contend that the judgment should be reversed for two principal reasons.  First, because the second modification of the lease is void, having been executed after the powers of the corporation had been suspended, and secondly, because applying the $20,000 which has been deposited as security for the faithful performance of the lease by the lessees, was void because it was a forfeiture, as provided by section 1670 of the Civil Code.

"Prior to 1929 every contract entered into by a corporation after its suspension for failure to pay its franchise tax was declared to be void.

"In 1929 the Bank and Corporation Franchise Tax Act was enacted and by section 32 of that act it is provided that failure to pay the said tax suspended the powers, rights and privileges of the corporation so failing, but also provided that every contract made in violation of this section should be voidable.  (Stats. 1929, pp. 19, 33.)  In 1931 this same provision making contracts voidable under said section 32 was continued in force by amendment of said section 32, Statutes of 1931, page 2228.

"A voidable act takes its full and proper legal effect unless and until it is disputed and set aside by some tribunal, entitled so to do.  (Bouvier's Law Dictionary, 3406.)  'Voidable' means subject to be avoided by judicial action of a court of adequate jurisdiction.  (8 Words and Phrases, 7342.)  And a voidable contract is one which is void as to the wrongdoer but not void as to the wronged party unless he elect so to treat it.  (*Inlow* v. *Christy*, 187 Pa. 186 [40 Atl. 823].)  A voidable contract is one which may be rendered null at the option of one of the parties, but is not void until so rendered.  (*Meridian Life Ins. Co.* v. *Dean*, 182 Ala. 127 [62 So. 90].)

"Inasmuch as the wronged party in the instant case has not by a judicial adjudication or otherwise declared the agreement of March 22, 1932, void, we are of the opinion that the said agreement remains in full legal force and effect."

As plaintiffs claim twelve mineral locations and the mill site location through L. V. Storrs, and as they took with notice of the defects in their grantor's title as well as the mining company's claim of title, they have no rights superior to those L. V. Storrs would have had had he not conveyed to them. As Storrs could not dispute his lessor's title it follows that the judgment as to these thirteen claims must be affirmed.

There remains for consideration the validity of the attempted location of the seven claims by Marie Bronson, who, it must be remembered, also had notice of the claims of the mining company to all of the locations.

Section 1426 of the Civil Code provides in part as follows:

"Any person, a citizen of the United States, or who has declared his intention to become such, who discovers a vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposit may locate a claim upon such vein or lode, by defining the boundaries of the claim, in the manner hereinafter described, and by posting a notice of such location, at the point of discovery, which notice must contain: . . .

"Fifth: Such a description of the claim by reference to some natural object, or permanent monument, as will identify the claim located."

It seems to be settled in California that the description in a location notice must be sufficient to convey to a prospector the information that a particular tract of ground has been claimed by the locator. (*Mutchmor* v. *McCarty,* 149 Cal. 603 [87 Pac. 85]; *McLean* v. *Ladewig,* 2 Cal. App. (2d) 21 [37 Pac. (2d) 502].)

The descriptions in the seven location notices of Marie Bronson are similar in legal effect so the quotation from one of them is sufficient. It is as follows:

"COMMENCING at this monument and running 750 ft. Easterly, 750 ft. Westerly, 300 ft. Northerly, and 300 ft. Southerly, This Claim joins the Marie #1 claim on the

South side, the Marie #3 on the North side, the Marie #4 on the East end, and the Marie #5 on the West end.''

The descriptions of all her claims are equally indefinite. No attempt is made to locate the monument. The claims might be anywhere in the Goldstone mining district of San Bernardino County. As the location notices do not conform to the requirements of our law, Marie Bronson gained no rights under them. It follows that she had nothing to convey to plaintiffs. This conclusion renders it unnecessary to inquire into her good faith in making the locations.

Plaintiffs complain of the judgment quieting the mining company's title against them without taking into consideration the money L. V. Storrs had expended on the mine. Evidence of these expenditures, if any evidence there be, was admitted over the objections of defendants which should have been sustained as no issue involving this question was made in the pleadings. This claim for compensation from the mining company is based upon the contract with Storrs to do the assessment work in exchange for 90,000 shares of the stock of the mining company and upon the lease between Storrs and the mining company and its extensions. The first contract fixed the only consideration flowing to Storrs as the 90,000 shares of stock. If that consideration has failed there may be some ground of complaint. Still, plaintiffs, as assignees of Storrs, cannot expect to recover without some appropriate pleading. The lease and its extensions gave Storrs, as his sole reward, the right to take his compensation out of the ore mined by him. Storrs sold the ore which he mined and kept the proceeds which gave him all the compensation to which he was entitled under his written contract. No obligation was created on the part of the mining company to pay Storrs anything for work done by him under the lease. It follows that neither Storrs nor his assignees can recover anything from the mining company.

On the record before us no right of recovery is shown on the part of Storrs or his assignees, the plaintiffs.

The judgment is affirmed.

Barnard, P. J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 25, 1938.