[L. A. No. 17678. In Bank. June 25, 1943.]

A. CAMINETTI, JR., as Insurance Commissioner, etc., Petitioner and Appellant, v. PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA (a Corporation) et al., Respondents; WILLIAM H. NEBLETT et al., Respondents and Appellants.

348

350

Mitchell, Silberberg, Roth & Knupp, Eugene P. Fay, and Peery Price for Petitioner and Appellant.

Wm. H. Neblett, in pro. per., Josiah Brill, E. Walter Guthrie, James P. Nunnelley, E. W. Miller, Vernon Bettin and Alfred F. MacDonald for Respondents and Appellants.

Overton, Lyman & Plumb, Donald H. Ford, Lyman P. Robertson, Cosgrove & O'Neil, John N. Cramer, Edward R. Young, Hanna & Morton, Byron C. Hanna, J. M. Mannon, Jr., Harold A. Black, Burnham Enersen and Hobson & Garrett for Respondents.

GIBSON, C. J.—In 1936, the business and assets of the Pacific Mutual Life Insurance Company of California (hereafter called the "old company") were taken over by the Insurance Commissioner of this state pursuant to statutory authority. (Ins. Code, §§ 1011 and 1013.) Thereafter, respondent Pacific Mutual Life Insurance Company (hereafter called the "new company") was organized as part of a plan of rehabilitation of the old company by the commissioner who purchased its entire capital stock with assets of the old company. Pursuant to section 1043 of the Insurance Code, a "Rehabilitation and Reinsurance" agreement was entered into between the new company and Samuel L. Carpenter, Jr., the then Insurance Commissioner, as conservator of the old company. The agreement contemplated a transfer to the new company of the assets of the old company (except certain claims against officers and directors of the old company) and the assumption by the former of the obligations of the latter, excluding what is known as "non-can" policies. The new company also assumed a limited obligation with respect to the non-can policies and agreed to set up a special fund for the restoration of benefits thereunder. The capital stock of the new company was to be held by the commissioner as conservator or liquidator for the benefit of the creditors, policyholders, and stockholders of the old company. On December 4, 1936, the agreement received court approval. The legality of the original seizure and the lawfulness of the plan

of rehabilitation were upheld on appeal. (*Carpenter* v. *Pacific Mutual Life Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761], affirmed in *Neblett* v. *Carpenter*, 305 U.S. 297 [59 S.Ct. 170, 83 L.Ed. 182].) On February 2, 1937, an order was made providing for the liquidation of the old company and appointing the Insurance Commissioner as liquidator. The legality of this order was likewise upheld on appeal. (*Carpenter* v. *Pacific Mutual Life Ins. Co.*, 13 Cal.2d 306 [89 P.2d 637].) The factual background of this prolonged litigation is set forth in the prior decisions and will be repeated here only insofar as is necessary to an understanding of the problems raised on the present appeals. (*Cf. Carpenter* v. *Pacific Mutual Life Ins. Co.*, 14 Cal.2d 704 [96 P.2d 796].)

On April 4, 1938, the stock of the new company was transferred by the then commissioner by a voting trust agreement to five persons named as voting trustees. Commissioner Caminetti succeeded to the office in June, 1939, and in June, 1940, sought an order directing respondents to show cause why the voting trustees should not be directed to retransfer the stock to him upon the ground that the voting trust was invalid. Prior thereto, and in December, 1939, a motion had been noticed upon similar grounds by William H. Neblett and others. On May 8, 1940, the superior court denied both applications. Appeals were taken from these orders of denial and are presented upon a single bill of exceptions. Certain contentions are made which are common to all appellants. Other contentions are made by Neblett et al., in which the commissioner does not join. For purposes of clarity they will be grouped under separate headings.

A. *Contentions common to all appellants.*

Appellants advance three main contentions in support of their claim that the voting trust is invalid. It is urged (1) that section 1037 (e) of the Insurance Code, relied upon by respondents as authority for the creation of the voting trust, is inapplicable to the stock of the new company; (2) that the section is unconstitutional if construed to authorize the voting trust; and (3) that court approval, not obtained in the present case, is required under the code for the creation of a voting trust.

(1) *Applicability of section 1037 (e).*

Section 1037 (e), enacted in 1937, provides: "Upon taking possession of the property and business of any person in any proceeding under this article, the commissioner, exclusively

and except as otherwise expressly provided by this article, either as conservator or liquidator: . . . (e) Shall have authority to transfer to a trustee or trustees, under a voting trust agreement, the stock of an insurer heretofore or hereafter issued to him as conservator or as liquidator in connection with a rehabilitation or reinsurance agreement, or any other proceeding under this article. Such voting trust agreement shall confer upon the trustee or trustees the right to vote or otherwise represent such stock, and shall not be irrevocable for a period of more than twenty-one (21) years.'' Appellants contend that this section must be construed to operate prospectively to the exclusion of the stock of the new company which had been issued prior to its enactment, and further that the section was not intended to apply to stock of an insurer organized, as was the new company, as a medium through which rehabilitation of the business of a delinquent insurance company was to be accomplished.

The rule that statutes are ordinarily construed to operate prospectively is based upon the presumed intent of the Legislature. (*Jones* v. *Union Oil Co.*, 218 Cal. 775 [25 P.2d 5]; *Krause* v. *Rarity*, 210 Cal. 644 [293 P. 62, 77 A.L.R. 1327]; *Anderson* v. *Ott*, 127 Cal.App. 122 [15 P.2d 526]; *Addiss* v. *Selig*, 264 N.Y. 274 [190 N.E. 490, 92 A.L.R. 1384].) It has no application where the Legislature manifests a contrary intent. (*McCann* v. *Jordan*, 218 Cal. 577 [24 P.2d 457]; *Krause* v. *Rarity, supra; Addiss* v. *Selig, supra; In re Bond & Mortgage Guarantee Co.*, 157 Misc. 240 [283 N.Y.S. 623].) Section 1037 (e) expressly includes ''stock of an insurer *heretofore or hereafter* issued'' to the commissioner. Its language is unambiguous and clearly indicates the Legislature intended a retrospective operation. (*Cf. Addiss* v. *Selig, supra; Westervelt* v. *Gregg*, 12 N.Y. 202 [62 Am.Dec. 160].)

To adopt the contention that section 1037 (e) was not intended to apply to stock of an insurance company organized as a medium through which rehabilitation of the business of a delinquent insurer was to be accomplished would require us to disregard the clear language of the statute. Section 1037 (e) specifically refers to stock issued to the commissioner ''as conservator or as liquidator in connection with a rehabilitation or reinsurance agreement.'' The intent of the Legislature must be ascertained from the language of the enactment and where, as here, the language is clear, there

can be no room for interpretation. (*First Congregational Church* v. *County of Los Angeles,* 9 Cal.2d 591, 594 [71 P.2d 1106]; *Riley* v. *Robbins,* 1 Cal.2d 285, 287 [34 P.2d 715]; *People* v. *Stanley,* 193 Cal. 428, 431 [225 P. 1].)

In view of our conclusion that the statute applies here, no prejudice could have resulted from the rejection of evidence offered by the commissioner to show that at the time of its enactment he held stock of other insurers to which the statute assertedly was intended to apply.

Section 1037 (e) authorizes a voting trust with respect to stock issued to the commissioner as "conservator or as liquidator." It has been suggested that the stock of the new company was issued to the commissioner not as "conservator or liquidator" but as a special contractual trustee. There is nothing in the rehabilitation agreement or court orders to indicate that this stock was issued to the commissioner in any capacity other than that of conservator or liquidator as contemplated by the section. The rehabilitation agreement refers only to stock held by the commissioner as "conservator or liquidator", and paragraph 25 provides that he is bound by the provisions of the agreement "only in his capacity as . . . Conservator or Liquidator of the Old Company." The court order of December 4, 1936, approving the agreement provides that the commissioner "as conservator . . . or . . . liquidator" is authorized to carry out its covenants. On appeal from that order, this court stated: "The Plan provides that the Commissioner, either as Conservator or Liquidator, shall continue to hold all of the stock of the New Company. . . ." (*Carpenter* v. *Pacific Mutual Life Ins. Co.,* 10 Cal.2d 307 [74 P.2d 761] at p. 322.) Finally, the order for liquidation of February 2, 1937, provides: "That title to all property and assets of respondent corporation . . . together with all right, title, and interest of said Commissioner *as Conservator* in said stock of [the new company] shall remain and be vested in said Commissioner . . . as *liquidator* of [the old company]." (Italics added.) It necessarily follows that the commissioner held the stock of the new company in his capacity as conservator or liquidator and not as a special contractual trustee. It has been held that the commissioner acts "as an officer of the state in the public interest" regardless of the fact that his "duties . . . as conservator are in the nature of those of a receiver or trustee." (*Anderson* v. *Great Republic Life Ins. Co.,* 41 Cal.App.2d 181, 188 [106 P.2d 75]. See, also, Insurance Code, §§ 1057, 1059; *Mitchell* v. *Taylor,*

3 Cal.2d 217 [43 P.2d 803]; *Carpenter* v. *Pacific Mutual Life Ins. Co.,* 10 Cal.2d 307, 330, 335, 338, 340 [74 P.2d 761]; *Garris* v. *Carpenter,* 33 Cal.App.2d 649, 654-656 [92 P.2d 688]; cf. *Evans* v. *Superior Court,* 14 Cal.2d 563 [96 P.2d 107].)

(2) *Constitutionality of section 1037 (e).*

It is next contended that section 1037 (e) as here construed is unconstitutional as a legislative impairment of contract obligations, as a taking of property without due process, as a legislative encroachment upon the powers of the judiciary, and as an unlawful delegation of legislative power. This follows, it is argued, because the voting trust assertedly violates the terms of the rehabilitation agreement and the orders of the superior court approving the same and providing for the liquidation of the old company. The contention that contract and property rights are impaired requires a consideration of the terms of the rehabilitation agreement and court orders, the rights thereunder, and the effect of the voting trust agreement thereon.

The rehabilitation agreement provides that the stock of the new company, which already had been organized as the corporate agent of the commissioner, shall continue to be held by the commissioner as conservator. (*Carpenter* v. *Pacific Mutual Life Ins. Co.,* 10 Cal.2d 307, 321-325 [74 P.2d 761].) The assets of the old company were to be transferred to the new company and, in return, the new company was to assume the obligations of the old company except with respect to the non-can policies. The new company also assumed a limited obligation with respect to such non-can policies and agreed to set up a special fund for the restoration of full benefits under those policies. Paragraph 20 of the agreement, entitled "Mutualization and Disposition of Stock of New Company," relates to the ultimate status and ownership of the new company. It provides that neither the conservator nor liquidator shall "dispose of" the stock of the new company except as follows:

Subdivision (a) authorizes the commissioner to dispose of the stock in accordance with any plan of mutualization thereafter adopted by the policyholders of the new company, and such a disposition may include a transfer to voting trustees if the plan of mutualization so provides. Subdivision (b) authorizes merger, consolidation, reorganization or reinsurance. Subdivision (c) gives the old company the option to

pay the full amount needed to restore benefits under the non-can policies and authorizes the commissioner in that event to distribute the stock upon court order. Subdivision (d) author-izes the commissioner to sell the stock upon court order if, at any time, he determines that such a sale is required for the protection of the estate in liquidation. Subdivision (e) states that "It is the purpose, spirit, and intent of this agreement that, unless the provisions for mutualization are eliminated pursuant to the provisions of subparagraph (b) of this para-graph 20, the stock of the New Company shall not be sold or disposed of prior to the full restoration of benefits under Non-Can Policies except by proceedings for mutualization, so long as a reasonable probability of completing restoration of benefits under Non-Can Policies shall continue. . . ." Sub-division (f) contains the usual severability clause.

The affairs of the new company are placed in charge of a board of directors to whom the agreement expressly confides a large measure of discretion. Supervisory powers, however, are reserved to the commissioner, independent of and in addi-tion to his statutory powers over delinquent insurance com-panies. For example, no investment or reinvestment of the assets of the old company may be made without written ap-proval of the commissioner. Payments to the restoration fund for non-can policies are subject to the approval of the com-missioner who, in addition, may require further payments thereto. The determination by the board of directors of the apportionment of expenses and the exchange of assets among the several departments of the new company is subject to adjustment by the commissioner. Reserves against policies of the old company subject to assumption or reinsurance under the agreement were to be established by the new com-pany with the approval of and in accordance with the re-quirements of the commissioner. While as holder of the stock the commissioner possessed the voting rights incident thereto, the agreement contains no express provision with respect to the exercise of the voting power.

The voting trust, on the other hand, is a contract between the commissioner as conservator or liquidator and named trus-tees. It recites that "it is one of the primary purposes of this agreement to assure the full accomplishment of all of the intents and purposes of the Rehabilitation Agreement in accordance with its terms. The parties hereto therefore de-clare that no provision of this agreement is to be construed in any manner which would result in a violation of any of

the terms, agreements, or provisions of said Rehabilitation Agreement; and *if any covenant or agreement provided herein . . . should be contrary to any express provision of said Rehabilitation Agreement, or contrary to the policy of said Rehabilitation Agreement . . . then such covenant or covenants, agreement or agreements, shall be null and void, and shall be deemed separable from the remaining portions hereof. . . .*" [Italics added.]

The trustees are given legal title to the stock of the new company with the power to exercise all the rights of ownership. The commissioner, however, retains the entire beneficial interest for the benefit of creditors of the old company and others interested. The voting trust undertakes to transfer to the trustees only administrative duties relating to the stock, principally the right to vote the same. The trust is made irrevocable for a period of slightly less than twenty-one years, except that it may be terminated sooner in accordance with the provisions of paragraph 20 of the rehabilitation agreement. Moreover, it must be conceded that the Legislature may terminate the trust at an earlier date.

The two agreements are not inconsistent, as contended by appellants, but on the contrary the voting trust agreement, as declared therein, is intended to and does supplement and facilitate the carrying out of the provisions of the rehabilitation agreement. The intent of the parties is apparent from that portion of the voting trust agreement, quoted above, which declares that if any of its covenants are contrary to the rehabilitation agreement such covenants "shall be null and void."

Appellants contend that the restriction against disposal in paragraph 20 of the rehabilitation agreement precludes the creation of a voting trust. This provision, they argue, gave the policyholders a right to have the commissioner administer the new company, by means of the power to vote its stock. Neither the language nor the purpose of the restriction supports the interpretation. Paragraph 20 relates only to the ultimate status and ownership of the new company, including possible mutualization and full restoration of benefits to non-can policies. It does not pertain to the administration of the new company or the supervisory powers of the commissioner which are fully set forth in other paragraphs. As indicated in subdivision (e) of paragraph 20, the purpose of the restriction is to prevent such a sale or disposition of

the stock as would permit the transferees to cut off prematurely the rights of the policyholders either to mutualization or to full restoration of benefits under the non-can policies. The words "dispose of," as used in the paragraph, are directed at any complete alienation of the stock, but do not prohibit transfer of the management of the company by means of transfer of the voting rights of the stock pending rehabilitation. The quoted phrase is used in this sense elsewhere in the agreement (paragraphs 1, 19 (e), 20 (a)).

■ Words used in a certain sense in one part of an instrument are deemed to have been used in the same sense in another. (*Pringle* v. *Wilson*, 156 Cal. 313, 319 [104 P. 316, 24 L.R.A. N.S. 1090]; 6 Cal.Jur. 286.) It is true that the words "dispose of" are used in subdivision (a) of paragraph 20 in connection with an authorization to the commissioner to transfer the stock of the new company to voting trustees in accordance with a plan of mutualization. But it is clear that under that subdivision the transfer there provided for would require a complete alienation of the stock in order to carry out the plan of mutualization contemplated therein.

■ The voting trust agreement is not a disposal of the stock within the meaning or purpose of paragraph 20 of the rehabilitation agreement. Although the trust agreement transfers to the trustees the legal title to the stock, it expressly reserves to the commissioner "the entire beneficial interest in such stock." The commissioner therefore retains for the benefit of the stockholders and creditors of the old company the same substantial interest he theretofore possessed as statutory trustee. As said in *Smith* v. *Bramwell*, 146 Ore. 611 [31 P.2d 647, 648-649]: "Notwithstanding plaintiff had transferred the legal title to his stock to the trustees, he was still the beneficial owner of the same. The trustees had no interest in the stock other than to vote it in keeping with the purpose of the trust agreement. . ·. . *He still to all intents and purposes, is a stockholder except that he has no personal right to vote his stock.*" To the same effect, see *Application of Bacon*, 287 N.Y. 1. [38 N.E.2d 105, 107]; *In re Morse*, 247 N.Y. 290 [160 N.E. 374, 379]; *State Tax Commr.* v. *Commrs. of Baltimore Co.*, 138 Md. 668 [114 A. 717, 721]. The reservation of the beneficial ownership of the stock, coupled with the fact that the voting trust may be terminated in accordance with paragraph 20 of the rehabilitation agreement and the further fact that the commissioner retained the supervisory powers given elsewhere in the rehabilitation agreement, is a complete an-

swer to the contention that the commissioner by creating the voting trust had transferred "all that he had."

Nor do we find any inconsistency between the voting trust and the court orders. The order of December 4, 1936, does no more than approve the rehabilitation agreement and the prior actions of the commissioner and provide for its enforcement. If the voting trust is consistent with the rehabilitation agreement, it is equally consistent with the court order. The voting trust does not interfere with the jurisdiction retained by the court over the commissioner. And, as stated in the order, the commissioner was authorized to do whatever was deemed reasonably necessary to effectuate the agreement "either with or without further order of this court." The order for liquidation of February 2, 1937, provides "that title to all property and assets of respondent corporation [the old company] now vested in said Commissioner as said conservator, together with all right, title and interest of said Commissioner as said conservator in said stock of Pacific Mutual Life Insurance Company [the new company], shall remain and be vested in said Commissioner, and his successor in office, as liquidator. . . ." This provision was "obviously . . . inserted in the liquidation order . . . in order to provide that the alteration in the commissioner's duties in carrying on the business of the old company as conservator, to winding it up as liquidator, should not divest nor disturb his titles." (*Carpenter* v. *Pacific Mutual Life Ins. Co.*, 13 Cal.2d 306, 312 [89 P.2d 637].) It does not purport to prohibit future changes in the commissioner's title.

The commissioner prior to the creation of the voting trust exercised the voting rights incident to stock ownership. It is contended, in effect, that continued exercise of this power by the commissioner is necessary to safeguard the interests of the creditors and is a substantive right acquired under the court order approving the rehabilitation agreement. The power conferred upon the commissioner to create a voting trust does not authorize him to alter or modify the substantive rights of the parties as set forth in any plan of rehabilitation and no such attempt was made in this case. Rather, it permits a transfer of the administrative duty of voting the stock from one state instrumentality to another. There is no constitutional right to a particular form of remedy or to the enforcement of such remedy by a particular state official. (*Neblett*

360

v. *Carpenter*, 305 U.S. 297, 305 [59 S.Ct. 170, 83 L.Ed. 182];
*Gibbes* v. *Zimmerman*, 290 U.S. 326 [54 S.Ct. 140, 78 L.Ed.
342]; *cf. In re Westchester T. & T. Co.*, 268 N.Y. 432 [198
N.E. 19].) Neither the rehabilitation agreement nor the court
orders undertake to restrict the power of the Legislature to
transfer the duties of the commissioner to another state in-
strumentality, and it may well be that any attempt to do so
would be improper.

The board of voting trustees created under section
1037 (e) may, in our opinion, properly serve as a state agency
or instrumentality, although its members are private persons.
Similar devices are familiar to the law. For example, the di-
rectors of a corporation in the course of dissolution were at
one time, by statute, made trustees to wind up its affairs—
their powers were derived from the statute alone and court
appointment was unnecessary. (*Rossi* v. *Caire*, 174 Cal. 74,
80-81 [161 P. 1161]; *Clark* v. *Millsap*, 197 Cal. 765 [242
P. 918]; 6A Cal.Jur. 1490-1493.) A privately owned corpora-
tion, together with a voting trust, was held a proper instru-
mentality of the United States for administration of German
chemical patents. (*United States* v. *Chemical Foundation*,
272 U.S. 1, 18-19 [47 S.Ct. 1, 71 L.Ed. 131].) National banks
are federal instrumentalities though they are privately owned
and controlled. (*Davis* v. *Elmira Savings Bank*, 161 U.S.
275, 283 [16 S.Ct. 502, 40 L.Ed. 700]; *First Nat. Bk.* v. *Cali-
fornia*, 262 U.S. 366, 368 [43 S.Ct. 602, 67 L.Ed. 1030]; *cf.
McCulloch* v. *Maryland* (U.S. 1819), 4 Wheat. 316 [4 L.Ed.
579]; 12 U.S.C.A., §§ 24, 51 et seq., 71.) The members of the
Board of Regents of the University of California are not pub-
lic officers. (*Lundy* v. *Delmas*, 104 Cal. 655, 658-660 [38 P.
445, 26 L.R.A. 651].) A new bank has been substituted for the
state superintendent of banking in the rehabilitation of an
insolvent bank. (*Doty* v. *Love*, 295 U.S. 64 [55 S.Ct. 558, 79
L.Ed. 1303, 96 A.L.R. 1438].) And in this proceeding a new
corporation was created as the corporate agent of the commis-
sioner in rehabilitating the old company. (*Carpenter* v. *Mu-
tual Life Ins. Co.*, 10 Cal.2d 307, 321-322, 324-325 [74 P.2d
761]; *Neblett* v. *Carpenter*, 305 U.S. 297, 302 [59 S.Ct. 170,
83 L.Ed. 182].)

Even if we were to assume, however, that exercise
of the voting power of the stock by the commissioner is a
contractual obligation under the rehabilitation agreement and
court orders, it would not follow that section 1037 (e) author-

izing exercise of that power by voting trustees violates the constitutional inhibitions against the impairment of contracts or the taking of property without due process of law. It is settled that contract and property rights must yield to legislation in the interest of the general welfare. (*Carpenter* v. *Pacific Mutual Life Ins. Co.*, 10 Cal.2d 307, 331 [74 P.2d 761]; *Agricultural Prorate Commission* v. *Superior Court*, 5 Cal.2d 550, 554 [55 P.2d 495]; *Veix* v. *Sixth Ward etc. Assn.*, 310 U.S. 32, 40 [60 S.Ct. 792, 84 L.Ed. 1061]; *Union Dry Goods Co.* v. *Georgia P. S. Corp.*, 248 U.S. 372, 375-377 39 S.Ct. 117, 63 L.Ed. 309].) ▆ That the power of the commissioner with respect to statutory proceedings against insolvent or delinquent insurers is of general public concern is not open to question. (See *Carpenter* v. *Pacific Mutual Life Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761]; *Mitchell* v. *Taylor, supra.*) It is for the Legislature to determine what the interests of the public require and what measures are necessary for their protection. (*Ex parte Quong Wo*, 161 Cal. 220, 230 [118 P. 714]; *State Sav. & Comm. Bank* v. *Anderson*, 165 Cal. 437, 443-445 [132 P. 755, L.R.A. 1915E, 65] affirmed in 238 U.S. 611 [35 S.Ct. 792, 59 L.Ed. 1488]; *Miller* v. *Board of Public Works*, 195 Cal. 477 [234 P. 371, 38 A.L.R. 1479]; *Nebbia* v. *New York*, 291 U.S. 502, 537-538 [54 S.Ct. 505, 78 L.Ed. 940]; *Erie Railroad Co.* v. *Williams*, 233 U.S. 685, 699 [34 S.Ct. 761, 58 L.Ed. 1155].) By its enactment of section 1037 (e) the Legislature has determined that the public interest is served by permitting the commissioner to utilize the voting trust technique of corporate control even as to stock theretofore issued to him. Its determination finds support in the following considerations: As statutory receiver of delinquent insurers stock of many insurers is issued to the commissioner with the result that the duty of exercising the voting power thereof would seriously encroach upon his time to the detriment of other statutory duties. The use of a voting trust also serves to obviate conflicting interests which might arise from the commissioner's exercise of the voting power incident to possession of the stock of an insurer and his exercise of regulatory power over insurance companies in general. It also makes possible continuity in management and uniformity in policy. ▆ The fact that the voting trust form of management is not mandatory but discretionary with the commissioner is not a valid argument against the propriety of the legislation. That other means were available to attain a legi-

timate objective does not render the statute unconstitutional. The authorization contained in section 1037 (e) constitutes a reasonable means of effecting the foregoing objectives.

The decision of the New York trial court in *In re Bond & Mortgage Guarantee Co.*, 157 Misc. 240 [283 N.Y.S. 623], cited by appellants, is not authority for the contention that section 1037 (e) is not a proper exercise of the police power. The case is factually distinguishable. There the Bond & Mortgage Guarantee Company [the old company] had guaranteed mortgage certificates issued by the Title Guarantee & Trust Company and the Bond Company also had a contract to service the mortgages. The Bond Company subsequently was rehabilitated under the Schackno Act (similar to Calif. Ins. Code, § 1043). The superintendent of insurance organized the Bond & Mortgage Corporation [the new company] and received its capital stock as rehabilitator of the old company. Pursuant to the court order a servicing contract was entered into between the new company and the Title Company. Subsequently the Legislature enacted the Mortgage Commission Act which purported to authorize the Mortgage Commission to take over from the superintendent certain assets of companies under rehabilitation, including servicing contracts. Holders of mortgage certificates sought to enjoin the Mortgage Commission from taking over the mortgages and the servicing contracts. The court held that the Legislature had no power to take from the new company assets that had been given to it pursuant to contract and approved by the court. Without considering the propriety of the holding in that case, we find it inapplicable here. It would be in point only if the Legislature in the present case had purported to take from the new company assets given to it under the rehabilitation plan.

 It is urged that while a private contract fixing private rights is subject to a proper exercise of the police power, a different rule obtains where, as here, the contract was imposed upon the parties in the first instance by the state acting in the interests of the general welfare. We know of no authority holding that in such a situation the state may not thereafter legislate on the same subject. On the contrary, the state cannot abdicate or bargain away its police power even by express grant (*Atlantic Coast Line R. R. Co.* v. *Goldsboro*, 232 U.S. 548, 558 [34 S.Ct. 364, 58 L.Ed. 721]), and rights under a so-called "public" contract are subject to further exercise of the power to which they owe their existence.

 The contention is made that section 1037 (e) as here

construed results in legislative encroachment upon the powers of the judiciary. This conclusion is based upon the premise that the Legislature's authorization of a voting trust sanctions a modification of the orders approving the rehabilitation agreement and providing for liquidation, in which orders the court directed that title to the stock should remain and be vested in the commissioner. As shown above, the voting trust agreement is not inconsistent with those orders. Assuming an inconsistency, however, no encroachment upon judicial power resulted. ■■■ Ordinarily the judgment of a court may not be modified or altered by legislative action (*Lincoln* v. *Alexander*, 52 Cal. 482 [28 Am.Rep. 639]; *State* v. *Wildes*, 34 Nev. 94 [116 P. 595]; *Gilman* v. *Tucker*, 128 N.Y. 190 [28 N.E. 1040, 26 Am.St.Rep. 464, 13 L.R.A. 304]) because a judgment is a form of contract protected by the contract and due process clauses of the state and federal Constitutions. (*Hodges* v. *Snyder*, 261 U.S. 600 [43 S.Ct. 435, 67 L.Ed. 819]; *Mooney* v. *Drainage Dist. No. 1*, 134 Neb. 192 [278 N.W. 368]; *In re Bond & Mortgage Guarantee Corp.*, 157 Misc. 240 [283 N.Y.S. 623].) A further reason has been advanced to the effect that such legislation is an infringement upon the functions of the judicial branch of the government. (See *Lincoln* v. *Alexander, supra; Mooney* v. *Drainage Dist. No. 1, supra*.) Thus, in *State* v. *Wildes, supra*, where the Nevada court had assumed jurisdiction in equity to appoint a receiver and conduct the liquidation of a bank, it was held that the Legislature could not by statute transfer that liquidation proceeding into the hands of the state bank examiner. The decision, however, is not controlling here. ■■■ This proceeding is wholly statutory. The duties imposed upon the commissioner, and the supervision over him vested in the courts, result from the statute. Responsibility for devising procedures of rehabilitation or liquidation rests with the Legislature and the fact that a particular procedure has been approved with respect to a specific plan of rehabilitation does not foreclose further legislative action with respect to procedural matters. In the case of *In re Westchester Title & Trust Co.*, 268 N.Y. 432 [198 N.E. 19], the court denied that infringement of judicial power resulted where the Legislature passed a statute transferring the functions of a court-appointed financing agent to a Mortgage Commission following the insolvency of the former. The court there said (p. 441): ''The Legislature could provide a new method for the

364

administration of these mortgage investments for the benefit of those interested in such investments without invasion of the equity powers of the Supreme Court over trusts." (*Cf. Estate of Barreiro*, 125 Cal.App. 153 [13 P.2d 1017].) Nor is the present situation altered because the superior court in its order of December 4 specifically retained jurisdiction over the proceeding. Jurisdiction was not expressly retained for the purpose of controlling or supervising the voting of the stock. The court had jurisdiction to correct any fraud or abuse in the exercise of the voting power by the commissioner. It possesses the same jurisdiction over the voting trustees (1 Restatement of the Law of Trusts, § 187) and the statute has not therefore curtailed the judicial function.

 It is also asserted that as here construed section 1037 (e) constitutes an invalid delegation of legislative power because there are no standards by which the commissioner is to be guided in determining when to set up voting trusts. The commissioner is given wide discretion and broad powers in the use of voting trusts in rehabilitation proceedings. The guide for the exercise of those powers appears in the concluding provision of section 1037 which authorizes him to do that "which he may deem necessary or expedient for the accomplishment or in aid of the purpose of such proceedings." This is the standard considered controlling by the Legislature and is sufficient under the decisions as against this challenge to the statute's constitutionality. (*Cf. Gaylord* v. *City of Pasadena*, 175 Cal. 433, 439 [166 P. 348]; *People* v. *Globe Grain & Mill. Co.*, 211 Cal. 121, 124 [294 P. 3]; *Jersey Maid Milk Products Co.* v. *Brock*, 13 Cal.2d 620, 642 [91 P.2d 577].) As said in *United States* v. *Chemical Foundation*, 272 U.S. 1, 12 [47 S.Ct. 1, 71 L.Ed. 131], "It was not necessary for [the Legislature] to ascertain the facts of or to deal with each case. The Act went as far as was reasonably practicable under the circumstances existing." It is peculiarly within the province of the commissioner to know the facts and to determine when a voting trust is expedient or necessary to effectively carry out a plan of rehabilitation.

(3) *Court approval.*

 Appellants contend that the voting trust is invalid because court approval thereof was not secured. Section 1037 (e), however, contains no requirement for court approval. The absence of such requirement indicates that none was intended. This is suggested by the opening paragraph of the

section which grants authority to "the commissioner, *exclusively* and except as otherwise expressly provided." It is also suggested by the fact that subdivision (d) of section 1037 as well as sections 1035, 1036, 1041, and 1043 expressly require court approval of certain acts of the commissioner. By the subsequent enactment of section 1037 (e) without such requirement it must be concluded that the omission was intended. Appellants insist, however, that the creation of a voting trust in this case came within the meaning of sections 1037 (d) and 1043 and therefore required the court approval contemplated by those sections. This contention would compel us to read such requirement into section 1037 (e). Section 1037 (d) authorizes the commissioner to sell, transfer or dispose of real or personal property of any person whose property and business has been taken over provided that, if the transaction involves property the market value of which is over $1,000, permission of court must be obtained. This requirement has no application to the creation of a voting trust under a separate provision of the statute which makes no specific requirement for court approval. A clear distinction exists between a disposal of assets under section 1037 (d) and a transfer of voting power to a board of trustees (another state instrumentality) under section 1037 (e) in which the substantive rights of the parties and the corpus of the trust are not disturbed. Section 1043 authorizes the commissioner to enter into rehabilitation agreements upon court order. Appellants contend that the voting trust was a modification of the rehabilitation agreement and was, in effect, a new and different plan of rehabilitation requiring court approval. As stated above, the voting trust does not alter or modify the provisions of the rehabilitation agreement. Even if it does, however, the modification concerns only administrative duties connected with the stock of the new company and does not alter substantive rights in any way. It follows that the voting trust does not constitute a new rehabilitation agreement for which court approval is required under section 1043.

B. *Contentions of Neblett, et al.*

We now turn to a consideration of the contentions of Neblett and others in which the commissioner does not join.

The Neblett motion urged that the voting trust was invalid because it constituted a contract in which Commissioner Carpenter was interested personally through ownership of policies of insurance in the old company, later converted into

policies in the new company. Political Code, section 920, provides: "Members of the Legislature, *state,* county, city and township *officers,* must not be interested in any contract made by them in their official capacity. . . ." Contracts made by a public officer in his official capacity may be avoided at the instance of any party except the interested officer where the officer has any direct or indirect interest therein. (Political Code § 922; *Moody* v. *Shuffleton,* 203 Cal. 100 [262 P. 1095]; *Berka* v. *Woodward,* 125 Cal. 119 [57 P. 777, 73 Am. St. Rep. 31, 45 L.R.A. 420].) The sole question in the present case is whether section 920 precluded the commissioner from making contracts relating to Pacific Mutual, for it must be conceded that persons may hold the *office* of commissioner although they own policies in companies subject to the act. (Prior to 1941 section 12901 of the Insurance Code provided "An officer, agent, or employee of an insurer is not eligible to the office of commissioner," but it did not render anyone ineligible because of ownership of policies, and in 1941 the section was clarified to specifically permit such ownership.) The Legislature has directed that certain provisions of the Insurance Code, including the sections authorizing voting trusts and rehabilitation agreements, are to be carried into effect by the commissioner. If the commissioner were disqualified to act with respect to delinquent insurers in which he holds policies, such insurers and their creditors and policyholders would be deprived of many benefits of the code. No other officer is authorized to perform the commissioner's duties, and if he cannot act, his agents or deputies would likewise be disqualified. In such a situation it must be assumed that the Legislature intended that the commissioner act regardless of the possibility that he might hold policies in the delinquent company. As said in 42 American Jurisprudence 312 "There is an exception, based upon necessity, to the rule of disqualification of an administrative officer. An officer, otherwise disqualified, may still act, if his failure to act would necessarily result in a failure of justice." The rule of necessity has been applied in this state to members of municipal bodies charged with hearing protests in connection with street assessments. (*Federal Construction Co.* v. *Curd,* 179 Cal. 489 [177 P. 469, 2 A.L.R. 1202]; *cf. Nider* v. *Homan,* 32 Cal.App.2d 11, 17 [89 P.2d 136].) The rule is not confined to officers exercising quasi-judicial functions. (*Marion Township of Boone County* v. *Howard,* 196 Ind. 167 [147

N.E. 619] ; *cf. Capital Gas Co.* v. *Young,* 109 Cal. 140 [41 P. 869, 29 L.R.A. 463].)

 Appellant Neblett contends also that the commissioner's personal interest in the voting trust is established by provisions therein granting him fees and expenses not authorized by law. The allowances to the commissioner are expressly limited to his expenses, and this cannot be held to give him a personal interest in the trust.

 It is also argued that the 1937 amendments to sections 1016 and 1037 had the effect of repealing the authority of the commissioner to hold title to the property of the old company as liquidator and of terminating the entire rehabilitation proceeding. After the amendments, section 1016 contained the following language: "Upon a full hearing of such application, the court may make an order directing the winding up and liquidation of the business of such person by the commissioner, as liquidator, for the purpose of carrying out the order to liquidate and wind up the business of such person." This language furnishes sufficient statutory basis for the exercise of the commissioner's duties under court order as liquidator of the old company, and does not constitute an implied repeal of the authority previously vested in him.

 Neither does the authority to set up voting trusts, conferred upon the commissioner by section 1037 (e), constitute an implied repeal of the provisions of section 1043 authorizing the commissioner to enter into plans of rehabilitation.

 Appellants contend that the omission of a requirement for court approval in the former section impliedly repeals the provisions of the latter section because, in effect, it authorizes the commissioner to create new plans of rehabilitation without court approval despite the fact that section 1043 requires court approval· for plans of rehabilitation. Repeals by implication are not favored in the law (*Rexstrew* v. *City of Huntington Park,* 20 Cal.2d 630, 634 [128 P.2d 23] ; *Railroad Commission* v. *Riley,* 192 Cal. 54, 57 [218 P. 415] ), and no implied repeal need be found under the facts of this case. Section 1037 (e) does not authorize new plans of rehabilitation without court approval.

 Finally, it is contended that the trial court lost jurisdiction to act in this proceeding by reason of its order made on February 5, 1940, continuing the hearing "until the completion of trial" of a concurrently pending action in equity involving the same issues, It is said that the equity action

was not completed until after the orders appealed from herein were made. The record shows, however, that appellants permitted the issues raised in this proceeding and in the equity action with respect to the voting trust to be heard together as a matter of convenience. Any error, therefore, in determining this proceeding before completion of the equity case must be deemed waived.

Additional grounds for reversal are suggested, based upon the alleged disqualification of the trial judge who denied the motions here involved and upon the asserted invalidity of the basic rehabilitation agreement. These questions are considered and determined in companion cases decided herewith. (*Caminetti* v. *Pacific Mutual Life Ins. Co., post,* p. 386 [139 P.2d 930] ; *Neblett* v. *Pacific Mutual Life Ins. Co., post,* p. 393 [139 P.2d 934].) The conclusion reached therein that the contentions are unfounded is determinative upon this appeal.

The orders are affirmed.

Shenk, J., Curtis, J., and Spence, J. pro tem., concurred.

PETERS, J. pro tem.—I dissent.

Two basic questions are presented on these appeals : (1) Is the voting trust agreement so inconsistent with the rehabilitation agreement that it impairs the obligation of contracts? (2) Can such a voting trust agreement be created under section 1037 (e) of the Insurance Code without court approval? On the first issue the majority opinion holds that the two agreements are not inconsistent, that there is no impairment of the obligation of contracts, and that even if there is such impairment it is justified under the police power. On the second issue it holds that, properly interpreted, the section authorizes the creation of the challenged voting trust without court approval. It is the position of this dissent on the first issue, that the two agreements are inconsistent; that the voting trust impairs the obligation of contracts by impairing the rights of thousands of policyholders who entered into contracts with the new company on the basis of a reorganization plan approved by them and the courts; that such impairment cannot be justified under the police power; and that the voting trust renders nugatory several judicial orders already made. On the second issue this dissent takes the position that the construction given the section by the majority

is not compelled by the language of the amendment; that it renders the section unconstitutional; that it results in the repeal by implication of another subsection of section 1037, and abrogates another section of the Insurance Code; and that such a voting trust can be entered into only after first securing court approval.

*Are the provisions of the voting trust agreement so inconsistent with the provisions of the rehabilitation agreement that they impair the obligation of contracts and vested rights?*

This question should be disposed of before the section is construed, for if the voting trust impairs the obligation of contracts and abrogates rights vested on the faith of the court approved rehabilitation agreement, the section, as construed by the majority, would be unconstitutional as in violation of both the federal and state Constitutions, unless such impairment is justified under the police power. This issue is relevant to the question of construction, because, if two equally reasonable constructions are possible, that which does not make the statute unconstitutional is to be preferred to a construction which accomplishes that result.

A comparison of the provisions of the two agreements demonstrates that they are incompatible. The voting trust provides for a disposition of the stock of the new company in a manner expressly forbidden by the rehabilitation agreement.

The voting trust agreement was entered into by Carpenter on April 4, 1938. Prior to that time Carpenter held the entire capital stock of the new company as a special trustee under the terms of a ''Rehabilitation and Reinsurance Agreement'' entered into on December 4, 1936, as of July 22, 1936. The history and background of that contract, approved by court order as required by law, have been sufficiently set forth in prior decisions. (*Carpenter* v. *Pacific Mut. Life Insurance Co.*, 10 Cal.2d 307 [74 P.2d 761], aff. in 305 U.S. 297 [59 S.Ct. 170, 83 L.Ed. 182]; *Carpenter* v. *Pacific Mut. L. Ins. Co.*, 13 Cal.2d 306 [89 P.2d 637]; *Carpenter* v. *Pacific Mut. Life Ins. Co.*, 14 Cal.2d 704 [96 P.2d 796].) Suffice it to say that the agreement was approved by the court after careful consideration to make certain that the rights of all persons with claims against the old company would be protected. Among other things, it provided that the commissioner should transfer to the new company all the property and assets of the old

company and that, in return, the new company should assume the obligations of the old company except with respect to a particular class of policies known as noncancellable policies. In a subsequent clause the new company also assumed a limited obligation with respect to the so-called "non-can" policies and agreed to set up, as rapidly as possible, a special fund for the restoration of full benefits thereunder. The entire capital stock of the new company was to be held by the commissioner as a contractual trustee for the purpose of carrying out the rehabilitation plan. The permit which authorized the new Pacific Mutual Life Insurance Company to issue 10,000 shares of capital stock, provided that the commissioner should subscribe for and purchase all of the authorized stock of the new company for which he was to pay $3,000,000 in cash. Section 6 of the rehabilitation agreement provides that the $3,000,000 paid by the commissioner for the capital stock is to constitute the capital and paid-in surplus of the new company.

Section 20 of the Rehabilitation and Reinsurance Agreement is entitled "Mutualization and Disposition of Stock of New Company." It provides that the commissioner, as conservator or liquidator of the old company, shall not dispose of any of the capital stock of the new company except as provided therein. The following exceptions are the only ones specified: Subdivision (a) of section 20 provides that the commissioner may dispose of the stock of the new company in accordance with any plan of mutualization which may thereafter be adopted by the policy holders of the new company, and that such a disposition might include a transfer to voting trustees if the plan so provided. Subdivision (b) contains other provisions not involved in the present problem. Subdivision (c) contains a provision giving the old company the option to pay off the amount needed to restore benefits under the "non-can" policies and authorizing the commissioner to dispose of the stock of the new company in accordance with any court order entered pursuant to such a full settlement of the obligations of the old company. Subdivision (d) authorizes the commissioner to sell the capital stock of the new company upon order of court if, at any time, he determines that such a sale is required for the protection of the estate in liquidation. Subdivision (e) provides: "It is the purpose, spirit, and intent of this agreement that, unless the provisions for mutualization are eliminated pursuant to the provisions of

subparagraph (b) of this paragraph 20, the stock of the New Company shall not be sold or disposed of prior to the full restoration of benefits under Non-Can Policies except by proceedings for mutualization, so long as a reasonable probability of completing restoration of benefits under Non-Can Policies shall continue. . . ." Subdivision (f) contains the usual severability clause. The effect of this plan of rehabilitation was to place in the hands of the commissioner legal title to the stock of the new company in return for which he parted with the assets of the old company. He held legal title as trustee for the benefit of the creditors and policyholders of the old company for whom the capital stock of the new company was the most important remaining asset. (*Carpenter* v. *Pacific Mut. Life Ins. Co.,* 10 Cal.2d 307, 335 [74 P.2d 761].)

On February 2, 1937, upon the application of Samuel L. Carpenter, Jr., as Insurance Commissioner, the court made an order of liquidation reciting that the commissioner had transferred all the assets of the old company to the new Pacific Mutual Life Insurance Company except the capital stock of the new company and any claims the old company might have against its past or present officers. The order stated that since any further efforts to conserve the business of the old company appeared futile to the commissioner, he was thereby appointed liquidator and directed to wind up its business. The rights and liabilities of the old company, its creditors, policyholders and shareholders were fixed as of July 22, 1936, the date when the rehabilitation plan became effective. Section 8 of the court's order of liquidation provided: "That title to all property and assets of respondent corporation [the old company] now vested in said Commissioner as said conservator, together with all right, title and interest of said Commissioner as said conservator in said stock of Pacific Mutual Life Insurance Company [the new company], shall remain and be vested in said Commissioner, and his successor in office, as liquidator of The Pacific Mutual Life Insurance Company of California."

When the commissioner, under the powers conferred upon him by the Insurance Code, took over the old company in July of 1936 every policy of the company, totalling millions of dollars, was placed in jeopardy. The agency organization and the good will of the old company was in danger of being lost. The rehabilitation plan, resulting ultimately in the court approved rehabilitation agreement, was an attempt by the

commissioner, acting pursuant to the provisions of section 1043 of the Insurance Code, to meet this emergency by creating a new company to take over the solvent policies. The basis of that plan was that, acting pursuant to the provisions of the agreement, the commissioner was to hold and control the stock of the new company until all claimants were paid. Pursuant to this fundamental policy the agreement expressly provided in section 20, quoted *supra,* that the commissioner was prohibited from disposing of the stock except as provided in the plan. Policyholders were given the election of accepting policies in the new company or of filing claims against the old company. As to both assenting and dissenting policyholders, an integral part of the contract was that the state Insurance Commissioner, until all claimants were paid, would control the policy and management of the new company through ownership of the stock. The inducement held out to secure court approval, and the inducement held out to the policyholders, was that the new company, under this plan, could not be returned into private management, but that the new company would remain under the management and control of the Insurance Commissioner until all claimants were paid. (*Carpenter* v. *Pacific Mut. Life Ins. Co.,* 10 Cal.2d 307, 332 [74 P.2d 761].) The superior court approved that plan on the basis of continued commissioner control, and the court's order of liquidation, quoted *supra,* expressly provided that the stock of the new company should remain in the commissioner and his successor in office. The action of the superior court in approving the reorganization agreement was affirmed by this court and by the United States Supreme Court, again on the hypothesis that by the agreement every interested person's rights were protected by the provision that control of the stock would remain in the hands of the commissioner and his successor in office. On that basis thousands of policyholders made their election. Direct and continuous commissioner control was the very essence of the court approved contract. Now what happened?

On April 4, 1938, after this agreement had been entered into and approved by the court, and after thousands of policyholders had changed their position in reliance thereon, Carpenter entered into the Pacific Mutual Voting Trust Agreement here challenged. It purports to be a contract between Carpenter as conservator and liquidator of the old company on the one side, and four named trustees on the other. The

voting trust agreement recites that the purposes of the rehabilitation agreement of July 22, 1936, will be facilitated by the transfer of legal title in the capital stock of the new company to voting trustees of established character and ability. Paragraph Fourth provides: "All of said stock . . . shall be received by the Trustees in trust, and shall be held, distributed, or otherwise disposed of, by the Trustees as provided in this agreement. While this agreement continues in effect the Trustees shall have full legal title to all shares of the stock of the Corporation [the new company] deposited with or held by them hereunder, and shall be entitled to exercise with respect thereto all rights and powers of every name and nature which the Depositor [the commissioner] had except as may be otherwise herein expressly provided." The trust was made irrevocable for a period of slightly less than twenty-one years except that it could be terminated sooner by the commissioner in the exercise of any of the powers of disposition over the stock reserved to him in Paragraph 20 of the Rehabilitation and Reinsurance Agreement. Paragraph Eighth of the voting trust agreement provides: *"The Trustees, during the continuance of this Agreement shall be vested with and shall possess and shall be entitled to exercise in their discretion all the rights and powers of an absolute owner of the stock held by them hereunder. . . ."* The trustees agreed to carry out faithfully the obligations of the commissioner as set forth in the rehabilitation agreement. Paragraph Eleventh states: "The Depositor [the commissioner], as herein provided, retains a beneficial interest in the shares of stock which are the subject matter of this Voting Trust. . . ." Paragraph Twenty-third provides: "It is one of the primary purposes of this agreement to assure the full accomplishment of all of the intents and purposes of the Rehabilitation Agreement in accordance with its terms. The parties hereto therefore declare that no provision of this agreement is to be construed in any manner which would result in a violation of any of the terms, agreements, or provisions of said Rehabilitation Agreement. . . ."

The obvious purpose and legal effect of this voting trust agreement was to transfer from the commissioner, a state official, to a board of private trustees, the legal title to the stock and all of the responsibilities and duties which devolved upon the commissioner as special trustee and holder of the capital stock of the new company under the rehabilitation agreement.

It does not require extended comment to demonstrate that the voting trust agreement violates the provisions of the Rehabilitation Agreement. Section 20 of the Rehabilitation and Reinsurance Agreement provides that the commissioner shall not dispose of the stock of the new company except as therein provided. The exceptions provided are: (1) Pursuant to the terms of any plan for mutualization of the new company; (2) according to court order if the old company proved able to pay off its obligations under the "Non-Can" policies; and (3) by court order where he deems it necessary to safeguard the interests of the estate in liquidation. The first and third of these alternatives contemplate a change in the corpus of the trust held for the creditors of the old company, the first by mutualization of the new company and the last by exchange of the stock of the new company for a more secure piece of property. The second alternative contemplates a termination of the trust in the event the old company raised sufficient funds to pay off its obligations.

The voting trust agreement transfers full legal title to the board of trustees in a situation where the rehabilitation trust is to continue, but it is not a transfer pursuant to a plan of mutualization nor one made in order to safeguard the estate in liquidation. If the creation of the voting trust were not contrary to the provisions of the rehabilitation agreement then section 1037(e) was superfluous. But the majority concedes that the sole source of power to transfer title to the stock to the voting trustees is to be found in that section.

The majority opinion does not dispute that this transfer is not provided for in the rehabilitation plan. It does, however, argue that the rehabilitation plan does not prohibit this transfer, urging that section 20 of the rehabilitation plan uses "dispose of" in the sense of an absolute disposition of the stock, rather than merely a transfer of legal title in trust. This argument is unsound. The rehabilitation plan by expressly providing that the commissioner shall not dispose of the stock except under certain specific conditions provides the exclusive modes by which the commissioner may dispose of the stock. The attempt to limit the meaning of "dispose" to absolute alienation is met directly by the fact that although one of the exceptions provided in the rehabilitation plan is a transfer to voting trustees, such a transfer must be pursuant to a plan of mutualization of the new company under section 20(a). Furthermore, under the rehabilitation plan the commissioner was a trustee for the creditors of the old company.

Thus, all he had was the legal title to the stock. The beneficial interest was in the creditors of the old company. Since all he had was the legal title, the transfer of all that he had is obviously a disposition of the stock within the meaning of the rehabilitation plan.

The majority opinion (pp. 356-357) lays great stress upon the provision of the voting trust agreement that "if any covenant or agreement provided herein . . . should be contrary to any express provision of said Rehabilitation Agreement, or contrary to the policy of said Rehabilitation Agreement . . . then such covenant or covenants, agreement or agreements, shall be null and void." Since the rehabilitation agreement expressly prohibits the commissioner's disposing of the stock except as specifically authorized, and since the disposition in question is not so authorized, the voting trust is void under its own provisions.

The majority opinion argues, however, that the two agreements are not inconsistent but that the voting trust agreement "is intended to and does supplement and facilitate the carrying out of the provisions of the rehabilitation agreement" (p. 357), and states that this is made apparent by the provision above quoted that if any covenant of the voting trust is contrary to the rehabilitation agreement it is null and void. The argument is that because the voting trust states that it was intended to facilitate the rehabilitation agreement, and because it states that if any of its provisions are contrary to the rehabilitation agreement such provisions are null and void, none of its provisions can violate the rehabilitation agreement. The *non sequitur* is obvious. The rehabilitation agreement provided that the commissioner should exercise the voting rights; the voting trust provides that such power should be exercised by the voting trustees. Such provision is "contrary to the policy of said Rehabilitation Agreement" and is contrary to an "express provision of said Rehabilitation Agreement." The provision of the voting trust purporting to transfer this power to the voting trustees is therefore "null and void" under the very terms of the voting trust.

The majority opinion states, however, that "Although the trust agreement transfers to the trustees the legal title to the stock, it expressly reserves to the commissioner 'the entire beneficial interest in such stock.' The commissioner therefore retains for the benefit of the stockholders and creditors of the old company the same substantial interest he theretofore pos-

sessed as statutory trustee.'' (p. 358.) It is true that the voting trust provides that the commissioner retains ''the entire beneficial interest'' in the stock. But it also provides that ''full legal title'' thereto is transferred to the voting trustees in order that ''they may exercise the rights of stockholders in the control of the Corporation,'' and that the trustees ''shall be entitled to exercise with respect thereto all rights and powers of every name and nature which the Depositor had'' except as expressly provided otherwise. A subsequent paragraph provides that the ''Trustees, during the continuance of this Agreement shall be vested with and shall possess and shall be entitled to exercise in their discretion all the rights and powers of an absolute owner of the stock held by them hereunder.''

The majority opinion in several places states that by the voting trust agreement the commissioner simply transferred the ''administrative duties'' of voting the stock to the trustees while retaining the ''beneficial interest'' in the stock. Just what is meant by a transfer of the ''administrative duties'' of voting the stock is not clear. The power that was transferred to the trustees by the voting trust was the power to vote 100% of the stock of the new company. What does that mean? It means that prior to creation of the voting trust the commissioner had the power to elect the entire board of directors of the new company. Through the exercise of that power he had the power and it was his duty to control the general policy of a corporation with several hundred millions of dollars of assets. It was these powers that he voluntarily transferred to the voting trustees. To characterize such important functions as the mere ''administrative'' duty of voting the stock does not minimize their importance. Moreover, the commissioner has retained no ''beneficial interest'' in the stock. He was not the beneficial owner of the stock, and never had a beneficial interest therein. He had the legal title as trustee, and the rehabilitation agreement so provided. In *Carpenter* v. *Pacific Mut. Life Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761] at p. 335, this court, in referring to what the record there showed, stated: ''It discloses that as trustee for all creditors of the old company, including dissenters, the commissioner holds all of the stock of the new company. . . .'' The creditors and policyholders and stockholders of the old company owned and still own the beneficial interest in the stock. The commissioner had the legal title subject to the terms of the trust set forth in the rehabilitation agreement.

He transferred all that title, all those rights, and all of his duties to the trustees. There was nothng of a "beneficial" nature or otherwise for him to retain. He transferred everything he had and retained nothing.

The majority opinion then seeks to show that there is no inconsistency between the voting trust and the various court orders. Of course if the voting trust is consistent with the rehabilitation agreement it is likewise consistent with the court orders. If a transfer of all his interest in the stock to the trustees did not violate the express provisions of the rehabilitation agreement prohibiting such transfer, then the transfer did not violate the similar provision in the court orders. But, as already pointed out, the voting trust does violate the provisions of the rehabilitation agreement. For the same reasons it violates the court order heretofore quoted.

The next argument advanced in the majority opinion is that the voting trust merely "permits a transfer of the administrative duty of voting the stock from one state instrumentality to another" (p. 359). On the next page of the opinion this thought is further elaborated upon, and it is definitely held that the voting trustees are a "state agency or instrumentality" and that all that section 1037(e) and the voting trust do is "to transfer the duties of the commissioner to another state instrumentality." The thought is then expressed that the voting trustees are a state board, agency or instrumentality in the same sense that national banks, although privately owned, are government agencies, or that the Regents of the University of California, although not public officials, constitute a governmental agency. Other illustrations of a similar nature are given. In all of the illustrations given in the majority opinion, however, the agency involved was not only designated by statute, but its duties and functions were fixed by law. (See the provisions of the National Bank Act, 12 U.S.C.A., sec. 21 et seq.; and the provisions of Art. IX, sec. 9, of the State Constitution, relating to the Regents of the University.) It is because of duties and functions imposed upon them by the statute that they are state agencies or instrumentalities, and not simply because the statute provides for their appointment. In the instant case neither section 1037(e) of the Insurance Code nor any other provision of law imposes any duties on the trustees. Their duties and functions are fixed by contract—the voting trust agreement. Except as provided in that contract their

duties are no different from those of any private trustee, and they no more constitute a governmental agency than do trustees appointed by will or contract.

The argument that the voting trustees constitute a governmental agency overlooks the nature and source of their functions under the voting trust. The commissioner's rights, powers and duties over the stock of the new company were not defined by statute—those rights, powers and duties arose out of and had their sole source in the contractual obligations and provisions of the rehabilitation agreement. It was these rights, powers and duties that were voluntarily transferred to the voting trustees by the commissioner. The rights, powers and duties of the voting trustees over the stock of the new company are not defined by statute. They have their sole source in the rehabilitation agreement. This being so the transfer by the commissioner to the voting trustees of a purely contractual power cannot make the trustees a governmental agency. They are contractual trustees appointed pursuant to statute. The only governmental function the commissioner exercised over the stock of the new company was as conservator or liquidator of the old company. The stock of the new company is the principal asset of the creditors of the old company. The commissioner still possesses all of his powers and duties as conservator and liquidator of the old company. None of those official duties have been transferred to the voting trustees. The commissioner is still the liquidator or conservator of the old company. Certainly it is not to be assumed that by the authorization to create a voting trust the Legislature intended to remove the commissioner as conservator or liquidator, and to substitute in his place the voting trustees. Yet the only way the voting trustees can be held to be a governmental agency is to hold, contrary to the fact, that the voting trustees have been substituted as conservator or liquidator in place of the commissioner. The true fact is that the voting trustees in voting the stock are not performing a governmental function at all, but are performing duties created solely by contract. That being so they are not in any sense a governmental agency.

When the superior court was asked to approve the rehabilitation agreement setting up a new company to take over the assets of the old company one of the major problems presented to the court and to the creditors of the old company was the selection of a trustee for the stock of the new company. After due consideration, the parties to the agreement,

and the court, determined that it was in the interest of all concerned to select a public official with the qualifications, experience, duties, functions and staff of the insurance commissioner. They could have selected a bank, a corporation, or private trustees, but, as a matter of contract, they selected the insurance commissioner as trustee. The legislature has no more power to permit that selected trustee to appoint another trustee in his place than it would have to provide that a private trustee selected by the trustor and beneficiaries could, without the consent of the trustor and beneficiaries, appoint another trustee. If this statute is constitutional, the trustor and beneficiaries of the trust, without their consent, are compelled to accept trustees that they never have selected, and, as this case demonstrates, that some of them do not want. Viewed in this aspect it makes no difference in result whether the voting trustees be considered a private board or a governmental agency. Where parties have, by contract, selected one public official as a contractual trustee, the Legislature is without power to authorize him to appoint another public agency in his stead without the consent of the contracting parties. The parties selected the Insurance Commissioner as trustee. They did not select the state Corporation Commissioner, the Fish and Game Commissioner or any other official to serve as trustee, and the Legislature, against the will of the contracting parties and without their consent, cannot substitute other trustees for the one agreed upon. In fact, the famous Dartmouth College case (*Dartmouth College* v. *Woodward,* 17 U.S. (4 Wheat.) 518 [4 L.Ed. 629]) established this principle. In that case the Legislature of New Hampshire attempted to change the trustees of Dartmouth College and to substitute new and different trustees. It was held, and there has been no deviation from that rule, that such legislative enactment was unconstitutional as an impairment of the obligation of contracts. It is apparent, therefore, that, at least in a case not falling within the police power, the rule that the state may lawfully transfer statutory functions from one state official or department to another, has no application to functions conferred upon the state official or department not by statute but by contract.

The majority opinion next holds that even if it be assumed that the voting trust impairs the obligations of the rehabilitation agreement, such impairment is justified under the police power. The majority opinion states that "it is settled that

contract and property rights must yield to legislation in the interest of the general welfare'' (p. 361). It is undoubtedly the law that contract rights are subject to alteration, without violating the impairment of obligation of contracts and due process clauses of the Constitution, when such alteration is necessary in the public interest. It is also undoubtedly the law that the state, under its regulatory power, may regulate the insurance business, and under certain circumstances, affect private contract rights. The cases cited in the majority opinion establish these general principles beyond doubt. The principle was clearly stated in *Home Building & Loan Assn.* v. *Blaisdell,* 290 U.S. 398 [54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481] at p. 434, where the court stated: ''Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' *Stephenson* v. *Binford,* 287 U.S. 251, 276, 77 L.Ed. 288, 301, 53 S.Ct. 181, 87 A.L.R. 721. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.'' (See, also, *Brown* v. *Ferdon,* 5 Cal.2d 226 [54 P.2d 712]; *Birkhofer* v. *Krumm,* 27 Cal.App.2d 513 [81 P.2d 609].)

It is imperative, however, that the impairment of contract rights be in the public interest. But what public interest could be served in the present case by relinquishing commissioner control and returning the management to private control? What public interest impelled changing the voting trust from one where the commissioner, as trustee, exercised sole power over the stock, to a private self-perpetuating, irrevocable voting trust? The superior court, this court and the United States Supreme Court approved the rehabilitation agreement because they were of the opinion that it was in the general

welfare of the policyholders, creditors and the public that the commissioner retain the stock for the protection of all concerned. No sound reason has been suggested why the public interest would be benefited or the general welfare advanced by a change in this policy. No emergency existed. There was no change in conditions between the time of the rehabilitation agreement and the time section 1037(e) was passed. The majority opinion suggests the possibility that the statute was passed to enable the commissioner to avoid a possible position of "conflicting interests." The argument proves too much. Section 1037(e) is not mandatory. It leaves it to the discretion of the very person in whom the conflict is alleged to exist—the commissioner—to determine whether the assumed conflicting interest shall be continued or settled. Had the Legislature been of the view that the general welfare required an impairment of vested rights because of an assumed conflict of interest it would have made the voting trust form of management mandatory and not discretionary. It is also suggested that the amendment might have been intended to permit the commissioner to avoid the burden of exercising the voting power. Had that been the intention of the Legislature it would have provided for the appointment of a person or persons responsible to him to perform this duty. But this amendment, according to the majority, permits the creation of a self-perpetuating board independent of the commissioner for twenty-one years. Moreover, the time to consider whether the burden of voting the stock was too onerous or whether that duty might conflict with his other duties was when the rehabilitation agreement was under consideration. At that time the commissioner, the superior court, this court and the United States Supreme Court determined that the duties under the rehabilitation agreement were not too onerous and that they did not conflict with his other duties. The very basis of the rehabilitation agreement was that the commissioner was the best informed, qualified, and impartial agency in the state to vote that stock. Of course, the Legislature could prohibit the Insurance Commissioner from accepting the position of trustee of such a trust, or could compel him to resign from trusteeships already accepted, if it determined that such duties were incompatible with the commissioner's statutory duties. In that event, however, the Legislature could not compel the contracting parties to accept a new trustee selected by the commissioner without their consent. Until the selec-

tion of a new trustee the trust would not fail, but, under accepted principles, would continue under the supervision of a court of equity.

Respondents also suggest the possibility that the Legislature may have believed that from a practical standpoint the commissioner might be unqualified, because of lack of knowledge, to elect competent directors. If the commissioner were unqualified to select directors whom he could replace at pleasure, he would be equally unqualified to select voting trustees, and in this latter situation any error in judgment would be irreparable for twenty-one years. The majority opinion also suggests that the legislation may have been intended to secure continuity in management. Such a contention assumes that the commissioner would arbitrarily and capriciously change the board. Had that concept motivated the legislation, the Legislature would have made the change mandatory and not discretionary.

A case directly in point on this issue is *In re Bond & Mortgage Guarantee Co.,* 157 Misc. 240 [283 N.Y.S. 623], interpreting the New York statutes dealing with rehabilitation from which most of our statutes on this subject were copied. There the New York Commissioner of Insurance took over the assets of an insolvent insurance company, and from its assets, with court approval, organized a new company as a guarantee corporation. This new corporation was to carry on the business of the old company retaining, as here, all its capital stock for the benefit of creditors. By court order the commissioner was authorized to enter into a contract with the guarantee corporation to service all mortgages of the old company. Thereafter the Legislature, purporting to act in an emergency, expressly provided that the Mortgage Commission should take over from the guarantee corporation all of the mortgages being serviced by it under the court's decree. The court held that the legislation, insofar as it purported to be applicable to rights vested pursuant to court decree, was unconstitutional. The court (p. 648 [283 N.Y.S.]) stated: ''When the language of a statute clearly requires a retroactive construction, it must be so construed though thereby it is held to be unconstitutional. *Westervelt* v. *Gregg,* 12 N.Y. 202 [62 Am.Dec. 160]. Retroactive statutes are not of themselves unconstitutional, but when they are in conflict with the provisions of either the Federal or the State Constitutions, a different result may follow. Such result follows where, as here, such a statute vio-

lates the right of the parties to such a servicing contract made part of any such order, to perform and to have performed the provisions of such contract, or it interferes with a vested right conferred by an order in the nature of a decree of which a servicing contract is made a part, finally adjudging the rights of the parties and the provisions of such contract. After a final determination of the rights of the parties to such a proceeding has been rendered, such rights 'have passed beyond the legislative power, either directly or indirectly, to reach or destroy. After adjudication the fruits of the judgment become rights of property. These rights became vested by the action of the court and were thereby placed beyond the reach of legislative power to affect.' *Gilman* v. *Tucker,* 128 N.Y. 190, at page 204, 28 N.E. 1040, 1044, 13 L.R.A. 304, 26 Am.St.Rep. 464. . . . The provisions of chapter 638 of the Laws of 1935, in so far as they purport to require turning over such servicing contracts made part of any final court order entered prior to May 1, 1935, deprive the guarantee corporation and the certificate holders, the real parties in interest, of their property without due process of law in conflict with article 1, section 6 of the Constitution of this state (*Livingston* v. *Livingston,* 173 N.Y. 377, 66 N.E. 123, 61 L.R.A. 800, 93 Am.St.Rep. 600; *Gilman* v. *Tucker, supra; Germania Savings Bank of Kings County* v. *Village of Suspension Bridge,* 159 N.Y. 362, 54 N.E. 33; *Burch* v. *Newbury,* 10 N.Y. 374) and are in conflict with the Fourteenth Amendment to the Constitution of the United States. *Coombes* v. *Getz,* 285 U.S. 434, 52 S.Ct. 435, 76 L.Ed. 866; *Memphis* v. *United States ex rel. Brown,* 97 U.S. 293, 24 L.Ed. 920; *McCullough* v. *Virginia,* 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382. Moreover, the aforesaid provisions of said amendment impair the obligations of contracts in violation of article 1, section 10, clause 1 of the Constitution of the United States. *Delmas* v. *Merchants' Mut. Ins. Co.,* 14 Wall. (81 U.S.) 661, 20 L.Ed. 757; *Red Rock* v. *Henry,* 106 U.S. 596, 1 S.Ct. 434, 27 L.Ed. 251; *County of Clay* v. *Society for Savings,* 104 U.S. 579, 26 L.Ed. 856; *Danolds* v. *State of New York,* 89 N.Y. 36, 42 Am.Rep. 277; *New York Sanitary Utilization Co.* v. *Department of Health,* 61 App.Div. 106, 70 N.Y.S. 510; *In re Cook,* 86 App.Div. 586, 83 N.Y.S. 1009.'' This reasoning is directly applicable to the statute here involved.

The majority opinion attempts to distinguish this case on the ground that all that the New York case decided was that

the Legislature could not take assets away from a new company set up pursuant to a court approved rehabilitation plan and turn them over to a state agency created as the result of an existing emergency. The point is that if the due process and contract clauses protect the parties to a court approved rehabilitation contract even in the face of an ''emergency'' alleged to exist by the Legislature, they certainly protect the parties when, as in the present case, no public interest is served by the impairment.

*Construction of Section 1037 (e)*

Independently of the constitutional argument, section 1037 (e) requires that there be court approval of any voting trust adopted pursuant to its provisions. There was no such approval of the present voting trust and it is, therefore, invalid.

Subsection (e) of section 1037 of the Insurance Code is but one of six subsections. The entire section enumerates the major powers of the commissioner when acting as conservator or liquidator. Subsection (d), which was part of the section long before subsection (e) was added in 1937, expressly provides ''that no transaction involving real or personal property shall be made where the market value of the property involved exceeds the sum of one thousand dollars without first obtaining permission of said court, and then only in accordance with such terms as said court may prescribe.'' Obviously, the relinquishment of legal title to all the capital stock of the new company for which the commissioner had paid $3,000,000 was a ''transaction involving . . . personal property . . . where the market value of the property involved exceeds the sum of one thousand dollars. . .'' The majority opinion emphasizes that subdivision (e), dealing exclusively with voting trusts, has no provision for court approval. This is not conclusive. A separate provision for court approval in subdivision (e) would be redundant in view of the broad provisions of subsection (d). The section must be read in its entirety, and effect, if possible, be given to each part thereof. To give subsection (e) the interpretation given to it by the majority of this court is to read subsection (d) out of the section in one significant type of ''transaction''—transfer of title to personal property by the creation of a voting trust.

Court approval of this voting trust is necessary for another reason. Subdivision (e) of section 1037 is a general provision dealing with the powers of the commissioner as conservator or liquidator. It does not deal specifically with reorganiza-

tions and rehabilitation agreements. The section permitting such agreements and the section under which the commissioner acted in executing the rehabilitation agreement here involved, is section 1043 of the Insurance Code. That section permits the commissioner, as conservator or liquidator "subject to the approval of said court" to enter into rehabilitation agreements. As already pointed out, the voting trust modified and altered the court approved rehabilitation plan. If a rehabilitation agreement requires court approval to be effective, any modification thereof requires court approval, for a modified plan is, in fact, a new and different plan. Any other construction would permit a material change in the rehabilitation plan without court approval and would thus nullify the requirement of court approval in the first instance. The majority opinion by construction reads the requirement for court approval out of section 1043.

*A holding that the voting trust is invalid does not render void the actions of the board of directors elected by the voting trustees.*

In the event this voting trust were held to be invalid it would not jeopardize the actions of the board of directors of the new company that had been elected by the voting trustees. There can be no doubt that the acts of the present board after their election are valid, even though the voting trust is void. Under our law the right to vote stock is dependent upon the records of the corporation, and since the voting trustees appeared in the books as shareholders, their right to vote the stock cannot be questioned. (Sec. 320(a), Civil Code; *Lawrence* v. *I. N. Parlier Estate Co.,* 15 Cal.2d 220 [100 P.2d 765]; *Los Angeles* v. *Owens River Canal Co.,* 120 Cal.App. 380 [7 P.2d 1064]; *Dedrick* v. *California Whaling Co.,* 16 Cal.App.2d 284 [60 P.2d 551].) A stockholder not appearing on the books who asserts his right to vote must seek the aid of a court either to secure a statutory review of the election, or to secure a re-transfer of the stock to himself. (Sec. 315, Civ. Code; *Moore* v. *Bowes,* 8 Cal.2d 162 [64 P.2d 423]; *Bowes* v. *Superior Court,* 13 Cal.App.2d 656 [57 P.2d 583]; *Los Angeles* v. *Owens River Canal Co., supra; Dedrick* v. *California Whaling Co., supra; Smith* v. *California Thorn Cordage, Inc.,* 129 Cal.App. 93 [18 P.2d 393]; *Lawrence* v. *I. N. Parlier Estate Co., supra.*) Even if it be assumed that the particular election of the board of directors by the voting trustees was invalid, they are at least *de facto* officers of the

corporation, and have the same powers as a *de jure* board. No attack can be successfully made on their corporate acts or on their status by collateral action. (See cases collected 6A Cal.Jur. 1068, et seq.; *Storrs* v. *Belmont Gold Min. & Mill. Co.,* 24 Cal.App.2d 551 [76 P.2d 197]; *Farbstein* v. *Pacific Oil Tool Co., Ltd.,* 127 Cal.App. 157 [15 P.2d 766]; *Consumers Salt Co.* v. *Riggins,* 208 Cal. 537 [282 P. 954]; 2 Fletcher, Cyclopedia of Private Corporations (1931), p. 142, et seq.; Stevens on Corporations (1936), p. 618, et seq.; California Corporation Laws (1938 ed.) by Ballantine, p. 90, sec. 82.) Thus no argument of expediency can justify the interpretation given the section in the majority opinion.

The judgment should be reversed.

Traynor, J., concurred.

Appellants' petition for a rehearing was denied July 22, 1943. Traynor, J., and Peters, J. pro tem., voted for a rehearing.